DIXIE FIRE INSURANCE COMPANY, *Plaintiff in Error*, v. HILLSBOROUGH DRY GOODS COMPANY, *Defendant in Error*.

## Opinion filed March 15, 1919.

In an action on a fire insurance policy, it is error to admit in evidence as an inventory of the goods claimed to have been burned, sheets of paper containing items copied by one person from slips made by others, when the sheets were not verified, nor supported by the original data or by testimony that the inventory was in fact taken of stock actually on hand or that the inventory is a correct statement of goods in stoock and the value thereof; and if no legal proof is made of the loss, a judgment for the plaintiff will be reversed.

A Writ of Error to the Circuit Court for Hillsborough County; F. M. Robles, Judge.

Judgment reversed.

*Whitaker, Himes & Whitaker* and *Cockrell & Cockrell*, for Plaintiff in Error;

*H. C. Gordon, Victor H. Knight* and *Thomas Palmer,* for Defendant in Error.

WHITFIELD, J.—In an action on a fire insurance policy for $2,000.00 the plaintiff was awarded a verdict and judgment for $1,500.00, and the defendant company took writ of error.

The pleadings were voluminous and the entire proceedings were prolix. It is necessary to discuss only one point that will dispose of this writ of error.

It being encumbent upon the plaintiff company to prove the amount of the loss, one of its officers testified that a complete inevntory of the stock of goods destroyed was taken June 16, 1913, to June 20, 1913, the fire occuring July 22, 1913. The witness produced as the inventory "papers * * * marked from pages 1 to 58 inclusive," totaling $65,107.27, and testified, on cross-examination, that the inventory is in his handwriting in ink. "Q. From what data did you get the information you wrote onto these sheets that are here? A. Come from the original invoices with the freight added, goods that had not been opened, original invoices of goods with the freight added, and from the stock as it was taken by the clerks. Q. Now, in talking about these various sheets that you have here; do you mean to say that these identical sheets were written by you in pen and ink during the time of the taking of the inventory. A. The clerks had been working on it for about three or four days. I wrote it all down—copied it—the nineteenth and twentieth. Q. What did you copy from when you wrote these out? A. From the clerks'—from the stock books as they would take the stock. Q. You copied this from the data that the clerks made taking the inventory and wrote on? A.

That is correct. Q. Where is the data that you copied these sheets from? A. I do not know where it is. Q. What date did the beginning of the taking of this inventory commence? A. I couldn't tell you whether it was the sixteenth or the seventeenth; all taken within three or four days and I couldn't tell you. Q. Name the men that took the inventory of the goods. A. I couldn't name the men. Q. You couldn't name the men? A. No, sir; I couldn't name the men. Q. Name some of them. A. Frank Richards, Mr. Page, Sam Wohl and Mr. Davis. That is all the men I think of. Q. Just what did—any one else you remember besides those? A. No, sir. Q. Just what did Mr. Page do, in the taking of this inventory? A. I have not the slightest idea. Q. Were you present? A. I don't know whether I was there when he was taking the inventory or not. I do not remember. I was in and out of the store all day, the same as usual, you know. Q. I don't know what you know. I am just inquiring. A. I say, that is what you asked me, was I present, and I say I don't know whether I was present or not. Q. Were you present when these other people were doing what they did? A. I was present all the time in and out, but I couldn't be with them—that is the duty they are obligated to do, to take stock, that is their business. Q. Did you stay with them to see whether they correctly counted the items? A. No, sir; I didn't stay with them. Q. Were you present when they wrote down these items on the data that they wrote it on? A. No, sir. Q. Did you verify it yourself afterwards, to see whether each item was on there correctly or not? A. No, sir. Q. Whose handwriting was this data in from which you copied these firty-eight pages? A. Different hand-writing, ten, twelve or fifteen. Q. In the hand-writing of ten or twelve or fifteen people, you mean?

A. Yes, sir.   Q. Different people?   A. Yes, sir.   Q. Name some of them besides Frank Richards, Mr. Page, Sam Wohl and Mr. Davis.   A. Bertha Goddard.   Q. All right, next?   A. Mrs. Sloane.   I don't know as I remember.   Q. Can you name any one else?   A. No.   Q. Can you name any one that helped you copy this?   A. No. Q. What time in the morning did the taking of this inventory begin?   A. I don't know.

"The Court:   Mr. Himes, do you mean the taking of the inventory proper by the clerks or by him.

"Mr. Himes:   By the clerks.

"Q. What time in the morning did the taking of the inventory by the clerks begin?   A. I don't know.   Q. Was the store closed?   A. No, sir.   Q. Did business continue?   A. Yes, sir.   Q. I will ask you first, who took the invetnory down stairs?   A. I don't know.   Q. Who took the inventory in the main floor of the brick building?   A. I don't know.   Q. Who took the inventory upstairs over the Central Pharmacy?   A. I don't know. Q. What part of the stock of goods was first inventoried by the clerks, the first day they began.   A. I can't tell you.   Q. What part of the goods was inventoried the second day?   A. I don't know.   Q. Can you indicate where. or what part of the goods the taking of the inventory began?   A. No, sir.   Q. Where were the goods that were in the boxes unopened that you say were included in this inventory?   A. Different places over the store.

"Mr. Himes:   Mr. Hylton, read the answer.

"(Answer read.)

"The Witness:   I mean by that different places in the store.   Q. On the first day of the taking of the invent-

ory to whom was the data delivered that was taken that day by the clerks? A. I took it and put it in the safe at night. Q. Are you positive of that? A. Yes, sir. Q. The question is who did they deliver it to? A. Delivered it to me, I think. Q. Are you positive? A. No, sir; I am not positive. Q. Are you positive it was put in the safe the first night? A. No, sir; not positive. Q. Now, the second day, are you positive who that was delivered to? A. No, I am not positive. Q. Are you positive as to any of the balance of the time? A. I am not positive. Q. Where was this data on the nineteenth when you began writing out this inventory; where did you get it from? A. From the clerk's report there in the office. Q. Where were those reports at that time? A. I do not know whether they were in the safe or right out in the office. I don't know. Q. As a matter of fact ,what did they write that data on, what sort of paper or document, describe it? A. I don't remember, sir. Q. What sort of instruments did they use in writing that data out? A. Pencil. Q. Are you sure of that? A. No, sir. Q. How much of this data was there that formed the basis for your copying those fifty-eight sheets. A. I don't know. Q. Did you write that inventory out during the day or at night only? A. Both. Q. Are you positive of that? A. Yes, sir. Q. Well, what time during the first day did you begin? A. I don't know. Q. How long did it take you to write out those fifty-eight sheets?. A. I don't know. Q. Mr. Fields, won't you tell us, please, how long it took you to write that? A. I don't know.

"And the said defendant, further to maintain the issue on its behalf, then and there propounded to the said witness the following question: Q. Do you have any other means of knowing as to the correctness of those items

VOL. 77, JANUARY TERM, 1919.        255

Dixie Fire Ins. Co. v. Hillsborough Dry Goods Co.—Opinion of Court.

contained in there except as you claim from data that was handed in there?

"But to the question as propounded the plaintiff did then and there object on the grounds that: the question is not as to the admissibility of the paper, and what is his knowledge concerning other matters does not pertain to this paper, and this examination must be confined to the admissibility of the paper.

"And the said judge did then and there sustain the said objection and refused to permit the said witness to answer the said question; and to which ruling of the court the defendant by counsel then and there duly and properly excepted.

"Q. Mr. Fields, you claim you wrote this thing out on the nineteenth and twentieth of June, nineteen and thirteen, as I understand you? Is that correct? A. That is correct.

"And there upon the defendant objects to the introduction in evidence of the said inventory on the following grounds: First, the necessary foundation has not been laid to entitle the plaintiff to introduce the inventory in evidence; second, the inventory is ex parte, is a self-serving declaration, is not under oath and does not bind the defendant in this case; third, the inventory has not been proved to be correct; fourth, the inventory is not the best evidence of the facts sought to be shown thereby; fifth, that the instrument offered in evidence is not the inventory made up; sixth, because the instrument offered in evidence is not the inventory of the stock of goods on hand at the time; seventh, that the instrument is merely hearsay testimony, the correctness of which has not been testified to, or in any way established.

"But the said judge overruled said objections, and admitted the said paper in evidence, to which ruling the defendant then and there excepted."

The witness also identified invoices of goods placed in the stock after the inventory and before the fire amounting to $2,505.03, and also gave evidence as to sales made after the inventory and before the fire, the total of the inventory being thereby increased by additions and reduced by sales to an ultimate total of $63,266.65. The plaintiff made no other proof of the goods lost or of their value. Other evidence by the defendant indicated the value of the goods in the stock at the time of the fire to have been less than $30,000.00, of which several thousand dollars' worth were saved.

There were other policies of insurance on the stock of goods, the defendant's liability being less than a thirtieth of the entire loss.

It is clear that the so-called invetnory made as testified to, not verified, not supported by original data or by testimony that the inventory was in fact taken of stock actually on hand or that the inventory is a correct statement of the stock of goods and its value, i. e., the 58 pages offered as an inventory, should have been excluded.

The amount of the verdict clearly indicates that the erroneous admission of the so-called inventory was harmful error for which the judgment is reversed.

BROWNE, C. J., AND TAYLOR, ELLIS AND WEST, J. J., concur.